# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

DOCKET NO. 3:05-CV-253-W

| | |
|---|---|
| SOUTHSTAR FUNDING, LLC, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>VICTORIA L. SPROUSE, )<br>)<br>Defendant. )<br>_____ ) | ORDER |

THIS MATTER comes before the Court for decision on various post-trial motions following a jury verdict returned on 2 February 2007. The jury found Defendant Victoria Sprouse liable to Plaintiff SouthStar Funding on theories of common law fraud and civil RICO, awarding $150,000 in actual damages and $1,000,000 in punitive damages.

**I.  Defendant's Rule 50(b) Motion for Judgment as a Matter of Law**

Sprouse moves for judgment as a matter of law on the civil RICO claim on the ground that Plaintiff did not establish the requisite pattern of racketeering activity, which requires proof both that "the racketeering predicates are related, and that they amount to or pose a threat of *continued* criminal activity." H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 239 (1989) (emphasis added). "'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." Id. at 241.

During trial (out of the presence of the jury), the Court opined that Sprouse's discovery abuses may have been part of a cover-up from which the jury could infer a continuation of her

fraudulent scheme on an open-ended basis through the time of trial. (E.g., Tr. at 809:48-810:3.) Sprouse cites case law from the Eleventh Circuit suggesting that discovery abuses, if intended "merely to conceal an underlying illegal predicate act[,] are not sufficient to establish the open-ended continuity required for RICO claims." See, e.g., Special Purpose Accounts Receivable Coop. v. Canadian Imperial Bank of Commerce, 202 F. Supp. 2d 1339, 1351 (S.D. Fla. 2002). SouthStar counters by citing Fourth Circuit law that acts of concealment, *if made in the form of a mailing*, may constitute predicate acts that comprise part of the requisite pattern. Morley v. Cohen, 888 F.2d 1006, 1009-10 (4th Cir. 1989). SouthStar then attempts to analogize the case at bar to Morley by arguing that Sprouse mailed to SouthStar false and/or incomplete documents in response to disclosure requests it made at the early stages of its fraud investigation. While SouthStar's legal points are not without merit, its overall argument is problematic in that no evidence of these mailings was ever introduced at trial.

The Court need not decide this issue, however, because an open-ended continuity theory based on Sprouse's discovery abuses was never argued or suggested to the jury, and the evidence adduced at trial is sufficient to support a jury verdict based on closed-ended continuity. The Court specifically instructed the jury on H.J.'s continuity requirement, stating:

> To prove that the predicate acts constituted a "pattern of racketeering activity," the plaintiff must also prove that the two or more predicate acts are related to each other and that they pose a threat of continued criminal activity.... To prove that the racketeering acts pose a threat of continued racketeering activity, the plaintiff must establish that (1) the acts are part of a long-term association that exists for criminal purposes, (2) the acts are a regular way of conducting the defendant's ongoing business, or (3) the acts are a regular way of conducting or participating in an ongoing RICO enterprise.

4-84 Modern Federal Jury Instructions–Civil, Inst. 84-27 (Matthew Bender 2006). The jury listened

attentively to both the evidence and the Court's instructions, and the jury's resulting findings of fact should not be disturbed unless, "without weighing the evidence or considering the credibility of the witnesses, substantial evidence does not support the jury's findings." Bonner v. Dawson, 404 F.3d 290, 295 (4th Cir. 2005).

Sprouse cites Judge Tilley's decision in Andrews v. Fitzgerald, 823 F. Supp. 356 (M.D.N.C. 1993) for the rule-of-thumb that a fraud scheme involving mailings to 91 victims over three years falls "in the grey area of the 'pattern' requirement." Id. at 373. However, the Fourth Circuit has "deliberately declined to adopt any mechanical rules to determine the existence of a RICO pattern, holding instead that the issue of criminal dimension and degree to be decided on a case-by-case basis." Parcoil Corp. v. Nowsco Well Service, Ltd., 887 F.2d 502, 504 (1989). In deciding the continuity issue, the factfinder may consider such factors as "the number and variety of predicate acts and the length of time over which they were committed, the number of putative victims, the presence of separate schemes, and the potential for multiple distinct injuries." Id.

It is true that the evidence in this case was focused on four real estate transactions involving perhaps a dozen mailings/wires and occurring all on the same day. This is largely a consequence of two things: first, SouthStar's principal need to prove its case and not exasperate the jury with extraneous matters not directly tied to its own losses; and second, the fact that SouthStar was significantly hobbled by incomplete discovery tying Sprouse to other fraudulent actors and transactions that was not forthcoming until the trial had already begun. Nonetheless, SouthStar was able to extract sufficient evidence from which a reasonable jury could infer that the continuity requirement had been met. For example, Sprouse testified that she performed over two hundred real estate closings for Mike Pahutski over a two-year period during which she admitted that Pahuski had

been actively involved in mortgage fraud. (Tr. at 309:7-17, 432:25-433:14.) Moreover, SouthStar was able to tie money flowing from the SouthStar closings to another known mortgage fraudster, Stephen Hawfield, for whom she had also closed mortgages in highly suspect circumstances.[1] Taking all factual inferences in the light most favorable to SouthStar, the Court concludes that there is evidence from which a reasonable jury could conclude that Sprouse's involvement in real estate fraud was sufficiently protracted, pervasive, and multifarious to satisfy RICO's continuity requirement. The Court therefore will not attempt to substitute a judicially devised rule-of-thumb for the jury's common sense conclusion on this issue.

## II. Defendant's Rule 59 Motion for New Trial

In the alternative, Sprouse moves for a new trial based on unfair prejudice resulting from (1) the Court's instruction of the jury on civil RICO, (2) the Court's ruling to admit evidence of

---

[1] The introduction of Mr.Hawfield into the equation had two significant effects. First, Sprouse's initial failure to disclose that Hawfield received a share of the proceeds from the fourth Petleski closing provided a *substantial inference to the jury that Sprouse had something about her business practices to hide.* Second, *Sprouse apparently did have something to hide.* Sprouse and Hawfield had a cozy relationship where Sprouse closed numerous deals in which Hawfield was a party or at least a beneficiary of the proceeds. (Tr. at 538:4-6.) The most questionable Hawfield transaction, involving a property at 1433 Jules Court, was a classic mortgage fraud. Hawfield, through the use of a straw purchaser (Fenn) who paid no money out-of-pocket, contracted to acquire real property from an innocent seller at approximately fair market value ($232,000); Fenn re-conveyed the property to Hawfield at an above-market price ($315,000) backed by a fraudulent appraisal; at the second closing, Hawfield obtained a mortgage on the property for $301,500; Hawfield used the mortgage proceeds to pay the sales proceeds due the original sellers ($232,000) and then profits by some $70,000. (Tr. at 557:5-566:16.)

Hawfield, with the aid of a corrupt or grossly negligent appraiser and closing attorney, has received financing on 135% of the true value of the property, far exceeding the standard 80% loan-to-value calculation used by lenders to extend financing. Hawfield uses the excessive financing to cover both the straw purchaser's cash payment and to skim some excess proceeds off the top. The jury could have reasonably inferred from the evidence that but for the churning of funds through Sprouse's trust account, it would have been impossible for Hawfield to use his loan proceeds for the second transaction to fund the payment in the first transaction. The jury necessarily concluded that Sprouse was grossly negligent for not detecting this but also could have easily inferred that she was a co-conspirator. Experienced prosecutors would call this churning and commingling of funds obtained through fraudulent appraisals and straw purchasers "money laundering 101." See generally Williams & Whitney, Federal Money Laundering: Crimes & Forfeiture § 5.1.4 et seq. (1999).

4

fraudulent real estate transactions unrelated to SouthStar's claims (other bad acts evidence), and (3) the Court's ruling to admit expert opinion testimony concerning a closing attorney's fiduciary duties.

As previously stated, the Court finds no error in the inclusion of the civil RICO charge. Thus, the admission of other bad acts evidence was proper as it was material to the proof of the "pattern of racketeering activity" element of that claim. Even if the inclusion of civil RICO was improper, however, any error that Sprouse claims was harmless. See Fed. R. Civ. P. 61. The Court would have allowed the other bad acts evidence under Fed. R. Evid. 404(b), given that Sprouse's entire defense was based entirely on a claim of ignorance and/or mistake.[2] Moreover, the verdict form set forth separate interrogatories with respect to the common law fraud and civil RICO claims, and it should be presumed that the jury followed the Court's instructions and properly distinguished fraud from RICO in its deliberations. Finally, any error was harmless because the evidence properly admitted concerning Sprouse's fraud was convincing, as reflected in the jury verdict itself. During the jury charge, the Court instructed the jury that it "should consider awarding punitive damages only if" it found liability on Plaintiff's "claim for fraud." The Court also instructed the jury that eligibility for punitive damages under North Carolina law requires a finding that Sprouse committed fraud "by clear and convincing evidence." By returning a verdict that included punitive damages, therefore, the jury necessarily found that clear and convincing evidence proved Sprouse's fraud – a conclusion

---

[2] After the verdict was returned in this case, the United States Supreme Court decided Philip Morris USA v. Williams, 549 U.S. ___, 127 S. Ct. 1057 (2007), in which the Court held that trial courts must take precautions to ensure that the jury does not impose punitive damages for conduct of the defendant toward persons who are not party to the lawsuit. However, the Court did not provide any specific instruction on how to handle a case that involves the introduction of other bad acts evidence as to the substantive claims. Because SouthStar did not specifically argue that the jury should consider this extraneous evidence in computing a punitive damages award and because Sprouse did not raise a Williams-type objection, the Court finds that there was no plain constitutional error in this case.

with which the Court concurs.

Finally, as to the expert opinions concerning a closing attorney's fiduciary duties, Sprouse argues that the admission of this testimony was erroneous and prejudicial in light of the fact that SouthStar ultimately withdrew its claim for professional malpractice. Sprouse misconstrues the Court's ruling on this evidence, however, which the Court allowed specifically because of its relevance to SouthStar's fraud claim. As the Court instructed the jury (with no objection) on the elements of common law fraud:

> A [fraudulent] concealment occurs when a person fails to disclose that which, under the circumstances, she should disclose. A person has a duty to disclose all facts material to a transaction or event where she has a fiduciary or contractual duty, she has made a partial or incomplete representation, or she is specifically questioned about them.

Accord Stamm v. Salomon, 551 S.E.2d 152, 158 (N.C. Ct. App. 2001). Moreover, the testimony about the duties and best practices of a closing attorney was highly probative of Sprouse's knowledge and intent to defraud, which were the key factual issues in dispute throughout the trial.

## III. Damages

The jury's return of a verdict on both common law fraud and civil RICO raises a host of issues with respect to damages, including (1) whether punitive damages are recoverable under civil RICO, and (2) whether punitive damages recoverable at common law for fraud may be stacked with RICO's treble damages.

As to the first issue, the Court determined at trial (and maintains still) that punitive damages are not available under RICO itself.[3] Punitive damages are a common law remedy, while RICO

---

[3] Indeed, the Court instructed the jury to consider an award of punitive damages only in connection with SouthStar's fraud claim.

damages are purely a creature of statute and thus limited to the extent of the statutory grant. See 18 U.S.C. § 1964(c) ("Any person injured in his business . . . shall recover threefold the injuries he sustains and the cost of the suit, including a reasonable attorney's fee . . . ."); cf. Glover v. General Motors Corp., 959 F. Supp. 332, 334 (W.D. Va. 1997) (holding, in the context of 49 U.S.C. 32710's trebling provision, that "the statute's determination of the proper measure of punishment is not subject to judicial amendment, in order to permit punitive damages.").

Importantly, statutory damages under RICO already contain a punitive component in the form of the trebling provision. See Faircloth v. Finesod, 938 F.2d 513, 518 (4th Cir. 1991); Gentry v. Resolution Trust Co., 937 F.3d 899, 914 (3d Cir. 1991). SouthStar's argument to the contrary – that RICO's private right of action is wholly remedial in nature – is not well-taken, especially in the context of the facts of this case. A statutory damages multiplier may have a remedial purpose in the sense that it provides the necessary monetary incentive for "private attorneys general" to undertake the expense of bringing a civil enforcement action. See Agency Holding Corp. v. Malley-Duff & Assoc., 483 U.S. 143, 151 (1987). However, civil RICO's automatic grant of attorneys' fees to a prevailing plaintiff significantly limits the need for treble damages to accomplish civil RICO's remedial function. Moreover, SouthStar vigorously litigated this case through the second day of trial – with no expectation of recovering attorneys' fees – before the Court allowed a constructive amendment of the complaint to assert a civil RICO claim, further demonstrating that treble damages would serve little remedial purpose in this case. A statutory damages multiplier may also be remedial in the sense that it is designed to fully compensate a plaintiff for intangible injuries where actual damages are often speculative or difficult to prove. E.g., Overnight Motor Transp. Co. v. Missel, 316 U.S. 572, 583 (1942) (construing the Fair Labor Standards Act); Getty Petroleum Corp.

v. Bartco Petroleum Corp., 858 F.2d 103, 109 (2d Cir. 1988) (construing the Lanham Act). Here again, however, damages for pecuniary injury to business or property are not typically difficult to ascertain, and SoutStar's actual damages in this case were a sum certain from the initial filing of the complaint.

"The prevailing view is that punitive damages are not available [under civil RICO] because the treble damages provisions of the RICO statute are punitive in nature." Toucheque v. Price Brothers Co., 5 F. Supp. 2d 341, 350 (D. Md. 1998). Thus, SouthStar's recovery under RICO is limited to $450,000 (3 times actual damages of $150,000) plus reasonable attorneys' fees (addressed below).

As to the second issue, SouthStar cites numerous foreign authorities in support of the proposition that state law punitive damages can be stacked on top of RICO treble damages. See, e.g., Neibel v. Trans World Assurance Corp., 108 F.3d 1123, 1131 (9th Cir. 1997) ("We hold that a plaintiff may receive both treble damages under RICO and state law punitive damages for the same course of conduct."). However, this is not the law in the Fourth Circuit. See Faircloth, 938 F.2d at 518; Ross v. Jackie Fine Arts, 1991 WL 213815, at *8 (D.S.C. 1991). As detailed at length above, RICO's trebling provision serves, at least in part, a distinctly punitive purpose. Allowing SouthStar to stack RICO treble damages and punitive damages would therefore result in an impermissible duplication of remedies.

RICO's saving clause does not compel a different result. See Section 904(b) of the Organized Crime Control Act of 1970, Pub. L. 91-452, 84 Stat. 922, 947 ("Nothing in this title shall supersede any provision of Federal, State, or other law imposing criminal penalties or affording civil remedies in addition to those provided for in this title."). Certainly, the "in addition to" language

suggests that SouthStar should not necessarily be compelled to make an absolute election between the state law remedy and the RICO remedy. Nevertheless, there are two independent reasons why SouthStar cannot recover the full amount of its state law punitive damages award plus RICO treble damages.

First, even if RICO's saving clause is construed to *authorize* the recovery of both treble damages and state law punitive damages, the public policy of North Carolina would not *permit* it. Numerous authoritative decisions from the state courts hold that punitive damages may not be stacked with statutory treble damages where the trebling provision is in part punitive in nature. Ellis v. Northern Star Co., 388 S.E.2d 127, 132 (N.C. 1990) (collecting cases); Pinehurst, Inc. v. O'Leary Brothers Realty, Inc., 338 S.E.2d 918, 925 (N.C. Ct. App. 1986). Importantly, however, North Carolina public policy does not require a wholesale election between statutory and common law remedies. Thus, SouthStar would be required to choose between statutory treble damages and common law punitive damages, but would not be prohibited from recovering its attorneys' fees under RICO even if it elected punitive damages under the common law fraud claim. See United Laboratories, Inc. v. Kuykendall, 437 S.E.2d 374, 378-80 (N.C. 1993).

Second, the Court is of the opinion that RICO itself should be interpreted to reach the same result. RICO's saving clause suggests that a plaintiff should not be put to an election between statutory and common law remedies (at least insofar as they are non-duplicative). Therefore, SouthStar should not be precluded from recovering, for example, both RICO attorneys' fees (even though attorneys' fees are not available at common law) and common law punitive damages (even though punitive damages are not available under RICO). However, none of this entails a legislative intent to permit a RICO plaintiff to receive a windfall double recovery, a result which would uproot

9

deep-seeded principles of our law. <u>Faircloth</u>, 938 F.2d at 518. Accordingly, the Court believes that SouthStar is required to make an election between punitive damages and RICO multiplied damages.

This leads to a final issue: What amount of punitive damages can the Court lawfully assess against Sprouse? N.C. Gen. Stat. 1D-25(b) provides: "Punitive damages awarded against a defendant shall not exceed three times the amount of compensatory damages or two hundred fifty thousand dollars ($250,000), whichever is greater." In this case, the maximum amount of allowable punitive damages is $450,000 (3 times $150,000).

SouthStar attempts to argue that North Carolina's punitive damages cap is unconstitutional under the dormant commerce clause because it is essentially an economic protectionist statute. Analysis of the dormant commerce clause involves a two-tiered approach. <u>Brown-Forman Distillers Corp. v. New York State Liquor Auth.</u>, 476 U.S. 573, 578 (1986). "When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, we have generally struck down the statute without further inquiry." <u>Id.</u> at 579. "When, however, a statute has only indirect effects on interstate commerce and regulates evenhandedly, we have examined whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits." <u>Id.</u>

Section 1D-25(b) passes muster under the first tier of review because the punitive damages cap does not on its face discriminate in favor of local interests – the statute applies equally to all persons and businesses, regardless of their place of domicile, who are hailed into North Carolina's courts. Section 1D-25(b) also passes muster under the second tier of review because it does not operate at the expense of out-of-state businesses seeking to do business in North Carolina from afar. While plaintiffs like SouthStar may not be able to recover as much in punitive damages in North

Carolina as they might in other states, plaintiffs do not have an expectation or entitlement in punitive damages in the first place. The sole purpose of punitive damages is to serve a public function by punishing the defendant for her wrongful conduct, not to benefit a private party in any way or make it whole for injuries sustained.

Moreover, to the extent that there are incidental burdens on interstate commerce, North Carolina's punitive damages cap serves a proper and important governmental interest. Wackenhut Applied Technologies Center, Inc. v. Sygnetron Protection Systems, Inc., 979 F.2d 980, 985 (4th Cir. 1992). The Supreme Court has held that it is runaway punitive damages verdicts which, if anything, pose dormant commerce clause issues. See BMW of North America, Inc. v. Gore, 517 U.S. 559, 571 (1996). And the Court has held that, to survive constitutional scrutiny, a punitive damages award must be "reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." State Farm Mutual Ins. Co. v. Campbell, 538 U.S. 408, 426 (2003). Thus, a state statute that limits punitive damages to a reasonable ratio of actual damages not only survives scrutiny under the commerce clause, but may also be necessitated by due process and other constitutional concerns.

## IV.  Attorneys' Fees

SouthStar's attorneys seek $195,703.69 in attorneys' fees and non-taxable costs for approximately 1,085 hours worth of work. By contrast, Sprouse's firm has billed only 795.7 hours litigating this case, and even that number is probably somewhat artificially inflated given the unusual turnover of defense attorneys.

The Court has reviewed Plaintiff's counsel's time sheets and agrees that the amount of attorneys' fees requested is excessive. For example, SouthStar at times had four attorneys present

in the courtroom during trial, although Ms. Higley (who billed for 31 hours and $5,115), who was acting as local counsel, served no obviously necessary role. SouthStar also seeks approximately $4,500 (26 hours) for researching and briefing its completely frivolous argument concerning the constitutionality of North Carolina's punitive damages cap, and at least another $8,000 (40 hours) researching and briefing issues that it lost (convincingly) in cross-motions for summary judgment over four stale causes of action. Finally, SouthStar improperly seeks $1,800 (10.5 hours) for time expended preparing for the *de bene esse* depositions of the Petleskis (when the Court ordered each party to bear its own costs arising from these depositions) and researching the "scope of cross[-examination] under the federal rules" (the Court believes that a young attorney's self-education of certain legal fundamentals should not be taxed to a losing party).

These are just examples of redundant or unnecessary work that occurred over the past eight months, since the undersigned began presiding over the case. Nor should it be forgotten that the lawsuit was over nine months in progress before SouthStar amended its complaint to state a viable cause of action (all of the claims in the original complaint being barred by the statute of limitation). The inescapable conclusion is that some excessive and/or unnecessary legal expenses have been incurred by SouthStar in this case which should not be taxed to Sprouse. Accordingly, the Court believes than a twenty-five to thirty percent reduction[4] in attorneys' fees is appropriate, and will award $140,000 in reasonable attorneys' fees.

V.     **Conclusion**

SouthStar shall be permitted to recover $150,000 in actual damages, $140,000 in reasonable

---

[4] The Court determined this ratio by using hours billed by Sprouse's firm as an approximation of time reasonably expended in this case. Thus, 1 − (Shumaker Loop & Kendrick hours billed ÷ Miles McGoff & Moore hours billed) ≈ 25%-30% discount rate.

attorneys' fees, and $6,983.40 in taxable costs. SouthStar shall make an election between $300,000 in statutorily multiplied damages under RICO and $450,000 in punitive damages. SouthStar's election shall be filed on the Court docket no later than Friday, 16 March 2007, upon receipt of which the Clerk is directed to enter judgment forthwith.

IT IS SO ORDERED.

Signed: March 13, 2007

Frank D. Whitney
United States District Judge